**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**DILLARD STORE SERVICES, INC.,**

**Plaintiff,**

**vs.** **No. 22-cv-00921 DHU/JFR**

**WINROCK PARTNERS LLC,**
**and INTEGRATED PROPERTY**
**SERVICESCOMPANY d/b/a**
**GOODMAN REALTY GROUP,**

**Defendants.**

**MEMORANDUM OPINION AND ORDER**
**REGARDING**

**(1) PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER**
**AND**
**(2) PLAINTIFF'S OPPOSED MOTION FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

Before the Court is *Plaintiff's Motion for a Protective Order to Preclude the Deposition of William T. Dillard, II,* and *Plaintiff's Opposed Motion for Leave to File Supplemental Declaration in Support of Motion for Protective Order*. Docs. 177, 179. The Court set an expedited briefing schedule, and the matters are fully briefed. Docs. 180, 183, 185.[1] Plaintiff seeks to prevent Defendants from deposing its Chairman and Chief Executive Officer, William T. Dillard, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. Plaintiff claims such deposition amounts to "harassing, burdensome discovery" because Mr. Dillard has no unique

[1] The Court determines that no reply is necessary as it relates to Doc. 179, *Plaintiff's Opposed Motion for Leave to File Supplemental Declaration*.

personal knowledge of relevant facts, the information he might provide is cumulative of the documentary record, his testimony is immaterial to the claims and defenses, and any information he might provide can be obtained through less burdensome means. Doc. 177 at 2. Plaintiff submits a "Declaration of William T. Dillard, III" which states that Mr. Dillard "was not responsible for the day-to-day negotiation or administration of individual store leases, site plans, or landlord relationships," that preparing for a deposition would divert his attention during the most important part of the retail year, that another individual handled communications with landlords, and that he "never communicated approval" of redevelopment plans at Winrock. Doc. 179-1 at 1-2.

Defendants respond that only Mr. Dillard can provide answers to questions about Dillard's "about-face position on the redevelopment of the Winrock Town Center only after Goodman bought it." Doc. 180 at 2. Defendants claim that Mr. Dillard is the "one individual who is and has been so obviously making *all* of the material decisions impacting Winrock and this case." *Id.* at 3 (italics in original). Defendants argue that Plaintiff has not carried its burden of showing a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements," that justify preventing the deposition from taking place. Doc. 180 at 9.

Plaintiff replies that the deposition of Mr. Dillard is not justified given that each fact Defendants seek is already established, time barred, or irrelevant. Doc. 183 at 1. For example, Plaintiff notes that it is already established by documents exchanged in discovery that Mr. Dillard never approved the 2005 redevelopment plan. *Id.* Additionally, the events in question—some of which having occurred over two decades ago—fall outside the limitations

period, and Mr. Dillard's reasons for declining the redevelopment plan are not evidence of liability, and therefore are not relevant. *Id.* at 2.

Upon consideration of the motions and as explained below, the Court **GRANTS** Plaintiff's motion to file a supplemental declaration of William T. Dillard II, as the Court deems the supplemental declaration is relevant to the Court's determination of Plaintiff's request for a protective order. Otherwise, the Court otherwise **DENIES** Plaintiff's motion for a protective order, but will limit the deposition of Mr. Dillard to **two (2) hours**.

BACKGROUND OF CLAIMS

Plaintiff Dillard Store Services, Inc. ("Dillard") filed suit against Defendants seeking damages for claimed contractual violations surrounding the redevelopment of the Winrock Mall which, according to Plaintiff, have occurred without its consent and to its economic detriment. *See generally* Doc. 81 (Second Amended Complaint). To further its claims, Dillard sought a temporary restraining order, then a preliminary injunction, which motions were denied by the District Judge. *See* Docs. 113, 169. The claims currently pending before the Court in Plaintiff's Second Amended Complaint are (1) Breach of Contract, and (2) Breach of Implied Covenant of Good Faith and Fair Dealing. *See* Doc. 81.

Defendants counterclaim and seek to recover damages "caused by Dillard's outright breach of its obligations under the Lease." Doc. 80 at 2, ⁋ 3. Defendants submit that Dillard interfered with Defendants' redevelopment efforts in order to break its lease and obtain ownership of its store in fee simple. "By engaging in such conduct, Dillard has breached not only the Lease but the covenant of good faith and fair dealing implied by law within the Lease, to Counterclaimants' ultimate detriment, causing many millions of dollars in financial damages for which Dillard should be held liable." Doc. 80 at 2, ⁋ 3. Defendants' counterclaims pending

before the Court are (1) Breach of Written Lease Agreement; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Tortious Interference with Contract; and (4) Tortious Interference with Prospective Contractual Relationships. Doc. 80; *see also* Doc. 178 (noting that Plaintiff's motion to dismiss counterclaims was denied as moot, and Plaintiff failed to refile motion by court-imposed deadline).

LEGAL STANDARDS

a. Discovery

Parties may discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*.

The scope of discovery under Rule 26 is broad. *See Gomez v. Martin Marietta Corp*., 50 F.3d 1511, 1520 (10th Cir. 1995). The 2015 Amendments to Rule 26 did not change the scope of discovery but clarified it. Relevancy is still a guiding consideration in discovery and should be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on." *See State Farm Mutual Auto. Ins. Co. v. Fayda*, No. 14-9792, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015) (Francis IV, M.J.) (internal quotation marks omitted) (*quoting Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). A party resisting discovery must establish a lack of relevance by demonstrating that the requested discovery falls beyond Rule 26's scope of relevance; conversely, when the request is overly broad on its face or when relevancy is not readily apparent, the party seeking the discovery has the burden to show

the relevancy of the request. *See Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 653 (D. Kan. 2006).

In addition to ensuring the discovery is relevant, a court must also ensure that discovery sought is proportional to the needs of the case. A court must strive to eliminate unnecessary and wasteful discovery and identify a party's actual need for the sought information. Accordingly, a district court is not "required to permit [a party] to engage in a 'fishing expedition' in the hope of supporting his claim." *McGee v. Hayes*, 2002 WL 1608456, 43 F. Appx 214, 217 (10th Cir. 2002) (unpublished); *see Tottenham v. Trans World Gaming Corp.*, No. 00 Civ. 7697(WK), 2002 WL 1967023, at *2 (S.D.N.Y. 2002) (unpublished) ("Discovery, however, is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." (internal quotation marks omitted)); *Hardrick v. Legal Servs. Corp.*, 96 F.R.D. 617, 618 (D.D.C. 1983) (noting that courts do, and should, remain "concerned about fishing expeditions, discovery abuse[,] and inordinate expense involved in overbroad and far-ranging discovery requests" (internal quotation marks omitted)). "[B]road discovery is not without limits[,] and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Gomez*, 50 F.3d at 1520 (internal quotation marks omitted).

b. The Apex Doctrine

The "apex doctrine" is rooted in Federal Rule of Procedure 26 which provides "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that ... the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2)(C). The doctrine serves to protect high-level executives and government

officials from having to sit for depositions. *Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 696-97 (D.N.M. 2019). The Tenth Circuit has never formally adopted the "apex doctrine" by name, but affirmed a district court's protective order shielding from deposition the chairman of the board of directors of a major corporation. *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 482-84 (10th Cir. 1995). There, in addition to procedural infirmities in the deposition notice, the Tenth Circuit considered the Chairman's affidavit which set forth his lack of personal knowledge of the issues of the case relevant to plaintiff's claim. The Circuit Court also noted that plaintiff made no attempt to demonstrate that the information she seeks to obtain could not be gathered from other individuals in the corporation. *Id.* at 483. Finally, the Tenth Circuit noted the hardship that would befall the Chairman were he to be required to sit for a deposition, given his business obligation scheduled for the date of the deposition. *Id.*

In recent years, courts in the District of New Mexico have considered the apex doctrine. Magistrate Judge Gregory B. Wormuth in *Tierra Blanca Ranch High County Youth Program v. Gonzales*, No. CV 15-850 KRS/GBW, 329 F.R.D. 694 (D.N.M. Jan. 8, 2019) shielded certain high level government officials from having to sit for depositions, and found most persuasive the approach taken by a judge in the District of Colorado in *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 2535067 (D. Colo. June 27, 2011). There, the magistrate judge set forth the factors a court should consider in deciding wither to issue a protective order:

> Under...the "apex doctrine," the Court may protect a high level corporate executive from the burdens of a deposition when any of the following circumstances exist: (1) the executive has no unique personal knowledge of the matter in dispute; (2) the information sought from the executive can be obtained from another witness; (3) the information sought from the executive can be obtained through an alternative discovery method; or (4) sitting for the deposition is a severe hardship for the executive in light of his obligations to his company. [...] [T]he party seeking to depose an executive bears an initial burden of making some showing that the executive has "unique personal knowledge" of some relevant issues.... Upon such a showing, the burden shifts to the executive to demonstrate by evidence that he in

> fact has no unique personal knowledge or that there exists one of the other three circumstances under which requiring him to sit for a deposition is inappropriate.

2011 WL 2535067 at *1-2.

In *Tierra Blanca Ranch*, Judge Wormuth considered a lawsuit filed by a property owner against a police officer alleging unlawful entry, unreasonable search and seizure, and unlawful detention. 329 F.R.D. at 698. The plaintiff issued subpoenas for the Governor, a Cabinet Secretary, and a District Judge, for depositions regarding statements they or their staff may have made regarding the Youth Program. *Id.* Judge Wormuth noted that the record revealed these individuals may have simply attended meetings about the investigation (Governor), or received information second-hand about the investigations (Secretary, Judge). *Id.* Applying the *Naylor Farms, Inc.* test, Judge Wormuth concluded that none of the three "apex" individuals sought to be deposed possessed the "unique personal knowledge" of facts relevant to any material issue, and accordingly granted protective orders as to each. *Id.*

Several years later, Magistrate Judge Steven C. Yarbrough also cited *Naylor Farms, Inc.*, noting that "[a]t its core… the apex doctrine is really just an application of Rule 26(b)(2)(C)." *Jacobs v. Journal Publishing Co.,* No. CV 21-690 MV/SCY, 2024 WL 3401048 (D.N.M. July 12, 2024), at *7. There, Judge Yarbrough found that the newspaper publisher may have personal knowledge of the newspaper's decision to leave a photo on its website (when the photo's copyright was asserted by Plaintiff and thereby in dispute), and of the newspaper's income sources, contracts and policies in place during the relevant time period. *Id.* Accordingly, Judge Yarbrough permitted a deposition of the publisher to proceed, but given the issues and burden on the publisher, limited that deposition to two hours. *Id.*

The undersigned agrees with these magistrate judges and finds, notwithstanding that the Tenth Circuit has not explicitly adopted the apex doctrine, the *Naylor Farms, Inc.* test

appropriately sets forth the necessary factors, informed by Rule 26, that a court must consider when deciding whether to shield a high-level executive from sitting for a deposition. The Court analyzes the current dispute through Rule 26(b) and the *Naylor Farms, Inc.* test.

ANALYSIS

The Court first addresses the relevance of Mr. Dillard's testimony in terms of the claims, defenses and counterclaims raised by the parties. Specifically, the Court assesses whether Defendants have met their burden of showing Mr. Dillard possesses "unique personal knowledge" of the matters in dispute, and if so, whether Dillard has demonstrated that an alternative witness, alternative discovery method, or undue burden exists which justify shielding Mr. Dillard from a deposition.

a. Is the information sought by Defendants relevant to their defenses or counterclaims? Does Mr. Dillard possess "unique personal knowledge" of information that goes to those defenses and counterclaims?

As the party seeking the deposition, Defendants bear the initial burden of showing that Mr. Dillard has "unique personal knowledge" of some relevant issues. The present lawsuit concerns events that occurred over the course of roughly two decades, some as far back as 2007 when Defendant Goodman was in the process of purchasing the Winrock Town Center. *See* Doc. 81 at 3, ⁋⁋ 11 *et seq.* (Second Amended Complaint); Doc. 80 at 4, ⁋⁋ 11 *et seq.* ("First Amended Counterclaim"). The District Judge recently clarified that Plaintiff's claims are subject to their respective statute of limitations. Doc. 178 at 2 (because "[t]he filing of [Plaintiff's complaint] occurred on December 1, 2022 [ ]…, [a]ny *claims* for these causes of action that relate to events occurring more than six years prior to the filing of this lawsuit are time-barred and **DISMISSED WITH PREJUDICE**.") (italics added; bold in original). The same would hold true for Defendants' counterclaims. Nonetheless, inquiry into *historical events* that concern pending

claims, defenses or counterclaims may still be relevant, even if those events are dated, as "[i]nformation within [the] scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Defendants argue that Plaintiff engaged in a pattern of obstructionism[2] that started as early as 2007 and continues to the present; if borne out by discovery, such information would appear relevant to Defendants' defenses and counterclaims.

Mr. Dillard was/is the Chairman and CEO of Dillard, Inc., during all of the events in question, and submitted a declaration in which he states that he never approved the "Prudential Plan" to redevelop the Winrock Town Center. Doc. 179-1 at 3. More broadly, Mr. Dillard explains that "the day-to-day negotiation and administration of individual store leases, site plans and landlord relationships" were handled by others in his enterprise. Doc. 179-1 at 1, ⁋ 2. The fact that Mr. Dillard himself may not have "approved" a redevelopment plan does not answer the question as to whether he rejected that plan; indeed, Mr. Dillard's failure to greenlight Defendants' redevelopment plan does not mean that he lacks "unique personal knowledge" of the business relationship between Plaintiff and Defendants. Defendants aver that those who were negotiating on Dillard's behalf—*e.g.* Wes Cherry, Chris Johnson—reported directly to Mr. Dillard, and that no important decisions were made regarding store leases without Mr. Dillard's approval. Doc. 180 at 11; *see also* Doc. 182 at 3, ⁋ 5 ("Declaration of Gary Goodman") (according to Mr. Goodman, Dillard representatives "would have to first check with William T. Dillard, II, before committing to things, even on seemingly inconsequential details that I would not expect an executive at Mr. Dillard's level to be involved in."). Because

---

[2] Defendants seek to have Mr. Dillard testify regarding his "about-face position on the redevelopment of the Winrock Town Center only after [Mr.] Goodman bought it", Doc. 180 at 2; about why he "vetoed" a settlement proposal, *id.* at 13; and about why he suggested that Mr. Goodman "either partner with Cousins or another developer of Dillard's liking, or sell Winrock Town Center altogether." *Id.* at 16. Defendants describe the question of why Mr. Dillard acquiesced in the former owner Prudential emptying out the mall as "potentially case-dispositive." *Id.* at 14.

Mr. Cherry is now deceased and Mr. Johnson wasn't involved in real estate in 2007, *id.*, Mr. Dillard's potential testimony assumes greater importance.

Notwithstanding a documentary record that suggests Mr. Dillard never personally approved the 2005 redevelopment plan ("Prudential Plan"), *see* Doc. 177 at 8-9 (listing Exhibits), Defendants are still entitled to try to prove their counterclaims that Dillard has been unreasonably obstructive over many years. The Defendants are entitled to inquire whether Plaintiff's rejection of their redevelopment plans was in violation of the terms of the Lease. *See, e.g.,* Doc. 80 (First Amended Counterclaim) at 11, ⁋ 30 (citing Lease, Sec. 16.03: "Tenant shall have the right to approve or disapprove, *in its reasonable discretion*, any construction or improvement on any Reserve Tract prior to the commencement of such construction of improvement.")(italics added). Again, allowing some inquiry into past events is consistent with the understanding that discovery should be broadly and liberally construed. *Sanchez v. Matta*, 229 F.R.D. at 654. "Relevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." *State Farm Mut. Auto. Ins. v. Fayda*, 14 Civ. 9792 (WHP)(JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)(internal quotation marks omitted) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)).

Finally, the Court engages in a proportionality analysis in determining the propriety of having Mr. Dillard sit for a deposition. Rule 26(b) requires the Court to consider a number of factors, including the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether burden or expense of the proposed discovery

outweighs its likely benefit. Fed. R. Civ. P. 26(b)(1). Importantly, "[i]nformation within the scope of discovery need not be admissible in evidence to be discoverable." *Id.*

Notably, Defendants' theory of the case is that Dillard interfered with their redevelopment efforts in order to break its lease and obtain ownership of its store in fee simple. *See* Doc. 80 at 2, ⁋ 3 ("By engaging in such conduct, Dillard has breached not only the Lease but the covenant of good faith and fair dealing implied by law within the Lease, to Counterclaimants' ultimate detriment, causing many millions of dollars in financial damages for which Dillard should be held liable."). Thus, Mr. Dillard's testimony regarding his company's conduct—and his role in that conduct, if any—is central to this lawsuit. Additionally, the amount in controversy—"millions"—is not insignificant. While Defendants have access to relevant documentary information, they lack important information from Mr. Dillard himself. The burden on Mr. Dillard is no different from other CEOs required to testify in a deposition.

The Court is satisfied that Mr. Dillard possesses "unique personal knowledge" of the business interactions between his company and the Defendants. The Court finds, therefore, that the information sought by Defendants through the deposition of Mr. Dillard is relevant and proportional to Defendants' counterclaims and defenses.

The Court next examines whether less burdensome sources of the same information are available that would make a deposition here inappropriate.

b. <u>Whether the information sought from Mr. Dillard can be obtained from another witness.</u>

The Court has little doubt that Mr. Dillard plays an active role in the strategic management and business operations of his business enterprise. His tenure at the helm of Dillard predates the Defendants' acquisition of the Center. A relevant question is how involved he was in the business dispute that has been ongoing between his company and the Defendants for the

past twenty years. If Defendants are correct that Mr. Johnson now, and Mr. Cherry before him, were required to report to Mr. Dillard on the status of negotiations, *see* Doc. 180 at 12 (re Mr. Johnson unable to commit without first seeing "what the weather is around here"), then it's reasonable to ask how much control Mr. Dillard had over these individuals' decision-making. Notably, the topics noticed by Defendants for their November 9, 2026, deposition of Plaintiff's Rule 30(b)(6) witness, *see* Doc. 177-2 at 7-9, concern matters of corporate involvement and knowledge, and not Mr. Dillard's personal involvement and knowledge, of the decades-old conflict. The Court is not convinced that the information sought by Defendants from Mr. Dillard can be provided by another witness. As such, Defendants are entitled to discover Mr. Dillard's knowledge of and involvement in the events underlying this longstanding business dispute.

c. Whether the information sought from Mr. Dillard can be obtained through an alternative discovery method.

The Court considers whether Defendants might obtain the information they seek from Mr. Dillard by another discovery method, such as service of interrogatories or requests for production and admission, or even the deposition of a 30(b)(6) witness. Here too, the Court is not convinced that interrogatories or requests are satisfactory, as even after extensive discovery and documentary exchange, Defendants still demonstrate the relevance of hearing directly from Mr. Dillard. Further, Defendants have taken the deposition of Plaintiff's Rule 30(b)(6) witness, see Doc. 183 at 2, and the Court notes that the topics noticed for said deposition concerned Plaintiff's corporate knowledge and involvement in the business dispute, but not Mr. Dillard's personal involvement in alleged obstructionism. *See* Doc. 177-2 at 7-9 (Defendants' Notice of Rule 30(b)(6) Deposition, "Topics"). Accordingly, the Court concludes that alternative discovery means do not substitute for deposition testimony.

d. <u>Whether sitting for the deposition is a severe hardship for Mr. Dillard in light of his obligations to his company.</u>

The Court understands that preparing for a deposition would impose a burden on Mr. Dillard. As he explains, "[p]reparing for a deposition concerning events from roughly two decades ago would require me to spend substantial time reviewing historical documents with counsel, in addition to time testifying." Doc. 179-1, ⁋ 3. Such time spent on preparation and in testifying would divert Mr. Dillard from his responsibilities to his enterprise, and Dillard is currently immersed in the holiday season, usually the busiest time of year for any retailer. *Id*, ⁋ 4. The Court balances this claimed burden with the Defendants' need for full and complete discovery, and finds that limiting the deposition in length to two hours in length is the appropriate compromise.

**IT IS THEREFORE ORDERED** that *Plaintiff's Opposed Motion For Leave To File Supplemental Declaration In Support Of Motion For Protective Order* (Doc. 179) is **GRANTED**; the Court accepts and considers the Supplemental Declaration attached therein;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Protective Order is **DENIED**, and Defendants will be permitted to take the deposition of William T. Dillard II. However, the deposition will be limited to **two (2) hours**.

**IT IS SO ORDERED.**

HON. JOHN F. ROBBENHAAR
United States Magistrate Judge